Pleasure of moving the admission of my four law clerks who wish to become members of the Bar of this Court. So, could you please stand? And Judge Moore will preside for purposes of these motions. First, I move the admission of David Bender, who is a member of the Bar, and has good standing of the highest court of New York. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And next, I move the admission of Stanley Chin, who is a member of the Bar and is in good standing with the highest court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Next, I move the admission of Andrew W. Robb, who is a member of the Bar and is in good standing with the highest court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And then finally, I move the admission of Alyssa Van Tubingen, who is a member of the Bar and is in good standing with the highest court of Illinois, and I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. And I'd like to say with respect to all four of you that not only do you have the necessary qualifications, which is sort of a minimum standard, but you have been exceptional law clerks, each and every one of you, and it has been an immense pleasure to have you, and I'm proud to have you as members of the Bar here, and I look forward to your appearing before us, and I'm sure you will do as excellent a job when you appear before us as you have as a law clerk. So, thank you. Any objections? I have no doubt, based on Judge Dyke's recommendation, that they're eminently qualified. This is one, I'd say, apart from marrying each of you someday, this is the most fun day ever. Well, some of you are married already. You better not be married. This is one of the nicest and most joyous things that we judges get to do for our clerks, so I welcome each of you to our Bar, and please turn and face the admiral, who will administer the oath. To each of you, stop on this word. To the court yourselves, and the attorneys and counsels, with the support of the right and the support of the law, I bid you the support of the Constitution and the United States. You may be seated. Congratulations. Welcome to the Bar. Congratulations. I will turn to our two cases this morning. The first of these is No. 14-1274, Memento Pharmaceuticals, Inc. v. Kebba Pharmaceuticals, Ms. Maynard. Thank you, Your Honor. Just as a preliminary matter, the court granted a motion to consolidate the argument for the two cases, and so we will be arguing, I'll be arguing both the first two cases in my opening position, and then I believe my colleagues in the office of the attorney will take their turns. That's fine. Thank you, Your Honor. May it please the court, D'Ann Maynard for Appellant Sandoz and Memento. Could I understand what your position is at this point? I've read the briefs carefully. Do I understand correctly that you're saying that the running of the process itself is protected by the safe harbor, but that the use of it for commercial sale is not protected and that there's an infringement under 271G as a result? Is that a fair statement of the position? No, Your Honor. That's partly correct. Our position is that the plain text of both Section 271E and 271G make both the use, the use is not protected under 271E and the sales are infringing under 271G. So your position is that the running of the test itself is not protected by the safe harbor? That's correct, Your Honor. The Ampistar and Tebbis Manufacturer are using Memento's patented method to make each commercial batch of enoxaparin for sale. That commercial exploitation of the patented invention is not covered by the plain text of Section 271E. Look, if I understand your brief correctly, what you're saying is that the running of the test has a dual purpose, that it's run to ensure FDA compliance and that it also, quite apart from that, has a commercial purpose. Is that my understanding of that correctly? Yes and no, Your Honor, if I may. So just a step back. When the safe harbor covers activities that one do to develop information for submission to the FDA for regulatory approval, that could be pre-marketing approval or post-marketing approval, but it would still have to be for developing information that one's going to provide to the FDA for some type of regulatory approval. That's how the Supreme Court has consistently interpreted the 271E and that's consistent with its purpose. But once one moves past... But why? Why? What in 271E says anything about approval? It says development and submission of information under a federal law. Why are you infusing the word approval? No doubt Mark and Lily talked about approval because they were approval cases, but I don't see where approval gets morphed into any more. Because it has to be the development and submission of information under a federal law. Here the federal law is the FDCA. That refers the court to the FDCA.  it repeatedly talks about submissions in the context of presenting something to the FDA for some sort of approval to do something. File an MDA to do a new drug. File an IND. File an ANDA. We dealt with that in the original opinion. Let's assume for the moment that we're not going to change that aspect of the original opinion, that the keeping of the information which is available to the FDA falls within the safe harbor. Let's just assume that for a moment. My understanding is that you are arguing that even if that is so, that the testing here has a commercial purpose that is unrelated to the FDA compliance. Is that correct? That's correct, Your Honor. So I would like to fight hard the premise that your first opinion should be binding. I think under Supreme Court law it isn't. All you decided was likelihood of success. But taking that premise, you are correct that they are not using the test solely to develop and submit information under the FDCA. They are using the test in their commercial manufacturing to decide which batches go into the final product and which batches do not. Okay, now that's where I'm a little confused because I've read the briefs and I've looked at the references in the test. What is the evidence that we have at this point that it has that commercial purpose unrelated to FDA compliance? So in the Amthastar record, there's a declaration from Mr. Crawford. Who's Mr. Crawford? He is a former pharmaceutical executive with lots of experience in the pharmaceutical industry. And he describes the purpose. It's in the Amthastar JAA, Your Honor. It is at JA-12-432. Is that in the first one? Yes, it is, Your Honor. It's very bound. Is your argument that the word solely means that if you're doing it in order to comply with an FDA requirement, but also doing it for commercial purposes, then wouldn't it qualify under the safe harbor? Because isn't everything you do for commercial purposes? Well, I think, first, Your Honor, and this would be fighting the premise of Judge Fagg's question, but there is nothing about required by the FDA in the text of the safe harbor either. The fact that the FDA requires manufacturers to retain these records applies to every drug for both branded and generic that's manufactured in the United States. If that is enough to fall within the safe harbor, then... Well, wait. Okay. So now you're arguing maintenance versus submission. I guess I... So there's two... I mean, you would say there are three statutory interpretation arguments here. I wouldn't agree with you on one of them. But the other two, where I'm open-minded, is the word solely and the word submission. I'm an all-out-on-the-table kind of gal. There's a lot of issues in this case, so I want to help you focus on what you might actually prevail on. So solely and submission. Tell me how I should construe solely, which is the heart of Judge Dyke's question, and that was also what I was getting at with you, but you then morphed your answer into submission versus maintenance. So I would like you, if you could, to keep those as separate and discrete. Thank you. Does that help? Yes, thank you, Your Honor. I'll focus on solely, but I would like to address submission because I would like to convince Your Honor... Why don't we do that later? Let's stick with one thing at a time, okay? Thank you. So you have this declaration. What does this declaration say about the commercial purpose of the testing that's non-FDA-related? The declaration, both the Crawford Declaration and the Ampistar record and the Wound Supplemental Declaration in the TABA record, establish that they're doing it for quality control purposes in order to sort which batches are the drugs, which drug they're trying to make and which batches are not the drug they're trying to make. Okay, so where do I find that in this declaration? Where does it say this? So if you look at JA-12-432. Okay. That's the beginning. I'm sorry. So paragraph 24 on 12-439. Okay. And that paragraph, not all of which I think I can read out loud, but essentially it establishes that they use the process on intermediate drug substance to decide which batches of intermediate drug substance conform to what they're trying to make and which do not. This is the 15% to 25%. Is that what I'm not supposed to say out loud? No, I'm allowed to say that. That's in the end. I think that's fine, Your Honor. Okay. Then they test their batches. So it's going along the assembly line. As a manufacturing company for quality control purposes, they want to make sure that what they sell is what they're intending to sell. They're checking it with our test, and that is a crucial step in their manufacturing process to decide what goes on and becomes in the syringe that they sell and what doesn't. Then if it passes the test, it gets joined together with other batches of conforming substance and ultimately continues along into the final product that is the syringe. They're doing the test for quality control purposes. Yeah, but the question is, are they doing the test for FDA purposes or independently for commercial quality control purposes? Is the FDA requiring them to do that quality control? The FDA requires drug manufacturers, yes, to do everything that they've promised to do in their ANDA or their NDA. But once you move into routine commercial exploitation of a patented invention, which is what this is, they're just using our process as part of making their ANASA pairing. And they don't have to use our process. That's a crucial factual difference between the record now... Well, is what you're saying that they would be doing this anyway even if there weren't an FDA requirement? As a drug manufacturer, a responsible drug manufacturer, they would definitely be doing something to make sure that what they're going to sell in their syringe is actually what they're purporting it to be and that they're selling it for. Yes, Your Honor. Otherwise, there's all kinds of consequences to drug manufacturers if they don't do that. Well, is this a disputed issue as to whether this is done for non-FDA purposes? Well, we've asserted in these declarations with the Lew Declaration and the Crawford Declaration that these are done for quality control purposes. I do think that this is not done solely... No, I understand what you think. What I'm asking you is, is this a matter that's disputed between the parties that there is this non-FDA purpose... I believe it is disputed. I expect they will tell you they're doing it solely to comply with the FDA's requirements, but I think they would be doing something to ensure that their product is... Would that then make it a question of fact that's inappropriate for resolution on summary judgment? At a minimum, that would require reversal. The summary judgment was granted in their favor on this record. But I would like to switch, if I may, to the submission... Before you do, I'm going to switch you a little bit on focus on this question. You argue that even if the safe harbor exempts commercial uses of the method, Kevin's sales activity isn't exempted. Has the patent on enoxaparin active ingredient expired? Yes, that's my understanding. Or you tell them about it. It's not in play anymore. Are there any patents on the actual chemical synthesis of the drug? I do not know whether anyone claims a patent on the manufacturing method. That would... Okay. What precedent or history supports the view that a patent covering neither the active ingredient nor the actual chemical synthesis should prevent the sales of enoxaparin as opposed to preventing use of the method? Because the whole purpose of the legislation was to prevent people from using patented processes by others in order to make products that they were going to sell. And so what TEVA has done is they've effectively done exactly what the principal purpose of the legislation was to stop, which is moved abroad or using our patented process abroad as an essential step to making the final product that they're selling, which is the drug in the syringe, to try to avoid liability. And when they bring that product... You're saying that a quality control process is a process by which the product is made? Is that the idea? The test for whether the product is made by something is whether it's an essential step to the end product. So you're... The answer is yes. In this situation, I don't think you have to... For example, let me give you an example. Suppose that there's a quality control test at the very end because I only want to sell the best of my batches. I want to really be known for just the purest form of something and the very best. And so at the end, I've got 20 things that could arguably be sold, but I want to sell only the top three and I do a quality control to see which one is the best, the purest, the whatever, and then I sell it. You would agree that that doesn't feel like made-by selling, right? That would definitely be a harder case, but that's not what we have here. What we have here is the raw material is on one end of the process. It moves along the manufacturing to the syringe that's sold. That would be more like testing the syringe. That would be more like the Phillip Adams case. This isn't that. This is in the middle of the process where at the place I point you in the Crawford affidavit, Your Honor, and then in the new supplemental declaration for Teva is JA 5162-69. This is testing of intermediate drug substance to decide what goes on and what doesn't. Let me make it simple so I can understand. I'm baking a cake. I got two bowls of white powder in front of me. One is sugar, one's salt. I don't know which one's which. Recipe calls for a cup of sugar and a teaspoon of salt. That's the salt. Boom. Is that part of the process, my fingers sticking in the salt to figure out which one is salt so I make the recipe properly, part of making the cake? I would argue it could be, Your Honor, this is a much more complicated situation here. The whole premise of their 271E argument is that this is a necessary step to determining whether what they're allowing to become in their final product is the inoculopare and sodium that they are allowed to sell. What happens when they're testing the intermediate? Suppose the intermediate flunks the test. Is it discarded? Yes, Your Honor. It's discarded, and that's what the batch records show and the records in here show that if one looks at the batch records in both of the JAs, one can see, and I can walk you through it if you want to take the time to do that, that the lots are, multiple batches are tested. If they pass the test, they are then joined together in one lot and then go along the process and are later formulated into the product that is the syringe. Under 271G, it is the product that is the syringe is the product that's the sale. This is testing. It's an essential step in the words of Bayer-Hauser and biotechnology. It's an essential step along the process. And we have to decide this question regardless of what we can put on 271E. Isn't that correct? That's true for two reasons, Your Honor. Both in Teva, that's the basis of the liability, and in the Ampistar case, it's the basis of the liability for Actavis and Watson, who are selling only. But to your point, Judge Wallach, the biotechnology case is closer to what we have here. It is a case about a plasmid. The patented method there makes the plasmid. The plasmid then makes another thing that makes the thing that is ultimately sold. So this is just like that. It's an essential step in the process from going with the starting heparin material to the syringe, and if you don't do it, you won't end up with the right thing in the syringe. So, Ms. Hussainer, can I move you now to Solia's submission? You really wanted to reach him before and nobody would let you, but I'd love for you to. So, first, before you actually tell me your arguments on the merits, I'd like you to tell me why it isn't either law of the case or some sort of binding precedent when some overly eager judge decides to write an opinion that addresses those issues of statutory interpretation, even though they weren't race-free, could argue about anybody at any point below or on appeal. So tell me why our court and or this case isn't governed by that prior decision of that overly type of judge. What the court was deciding before was whether or not Momenta was likely to succeed. That was the limit of your holding. The court stated it multiple times in its opinion. And wasn't it true that only pre-approval and post-approval was argued to us, but not solely or in the submission maintenance question? That's correct, Your Honor, which is precisely why It wasn't argued below. It wasn't argued to us last time. That's exactly right, Your Honor, which is precisely why the Supreme Court had said that the preliminary injunction opinions are only about what they've decided, which is who's likely to succeed. But there are two key aspects, but one of the ones you have focused on, Your Honor, is exactly right, which is neither submission nor maintenance or the distinction that the FDCA draws between those two terms was briefed before this court, and it's very significant to the ultimate outcome on the merit tier. It's now in this record. The FDCA treats those two terms differently. Wouldn't it be fair to say that the first time around this issue of 271G infringement and the question of whether this testing has a non-FDA purpose was not argued, right? That's true, too, Your Honor. And also in addition, the test that we sought to leave to amend in the district court, which the district court swept in under 271E, were not before the court before, and we think the district court has done an overly generous view of 271E to keep us from amending those, and that that has an error of law, and we should be allowed to add those tests as well. But to Judge Moore's point, the submission point is clear from the text of the statute that submitting and maintaining are two distinct activities. Well, it's clear from the text of the FDCA statute. It's not clear from the text of the Hatch-Waxman Act. I can't find the word maintaining anywhere else in the relevant statute that we're actually enforcing here. I mean, do you agree? Yes, but that's helpful to us, Your Honor, because it's only the development and submission of information that falls within the safe harbor. The maintenance of information doesn't fall within the safe harbor. But also, to your point, it's the development and submission of information under a federal law, and as you know, the FDCA is one of those federal laws, so it makes sense to look to that law to see what the submission and that law makes clear. It repeatedly uses submission. Sometimes it's post-marketing approval, but it's submission, submitting a change to use the drug for a new use, submitting a change to your label, but just the ordinary routine maintenance of commercial records is not called a submission. Because you have to maintain everything. Labeling, shipping documents, basically any piece of paper that is produced in the course of manufacturing, shipping, selling, or anything to do with drugs is required to be maintained. Exactly. Under the same backdrop. You're kind of going to run out. Before we get to selling, one more question on that. It seems to me there's a difference here between the maintenance of all the manufacturing records to show that you're complying with your own manufacturing procedures, and maintaining records that are designed to show that you are complying with FDA requirements. This falls into the latter category, doesn't it? All records, though, Your Honor. There are so many FDA requirements. You're required by the FDA to do everything that's in your NDA and in your ANDA. And then you're required by these batch regulations that the Court relied on in Amendment 1 to keep records of all of it. So basically what you would be able to do under the logic of Amendment 1 is here, propose Sanofi's method of manufacturing in your ANDA. I think you're not addressing my question, which is whether there's a difference between keeping records which show that you're complying with an FDA requirement, and everybody agrees there's an FDA requirement here, and keeping records which are designed to show your manufacturing process. So if there's an issue later on, it's your manufacturing process that can be looked at for that purpose. In other words, not all of the records that you're talking about are designed to document compliance with FDA requirements. No? Or am I mistaken? Yeah, I'm not sure. I was like, I'm not sure there's a distinction that you're trying to draw, Your Honor. All the records are required by the FDA. You're required to keep all of these records, like everything that you do. It's a Venn diagram, in effect. The FDA requires you to keep all the records you say you're going to keep, as well as everything else we tell you to keep. I can give a more precise answer when I stand up, Your Honor, but I just don't think there's a distinction, and it wouldn't matter here. It would still make the safe harbor a safe ocean. You would still be able to tell the FDA that you were going to use someone else's patented method to make your product, and as long as your ANDA was approved, then the FDA doesn't look to see whether or not, it's not approving ANDAs and NDAs based on any patent based test. It doesn't look to see whether you're violating somebody's patent. Nothing in the safe harbor suggests that the FDA was given compulsory licensing authority by requiring or the UAP for that matter. But this one has to show bioequivalency to the NDA product, right? No, Your Honor. So just to step back, bioequivalency is something you show during the regulatory approval process in order to be allowed to make a generic drug. Bioequivalency is that your drug will have the same effect on the human body as the branded drug. Once you get marketing approval, then you simply have to comply with the manufacturing processes that you told the FDA you were going to do. That's what every drug manufacturer does. That's what these batch regulations are for. We have not charged with infringement any activity that occurred for the purposes of showing bioequivalency to get approved. I understand that, but I thought the purpose of these tests was to show that the continued manufacture of the product was the same as what was proposed in the first place. No, Your Honor. The purpose of these batch regulations and this is in our reply brief like on pages the very introduction of the gray brief to the Amstar case is to show that you are complying with the manufacturing procedures that you told the FDA you would comply with. There's not this that Amstar argued in the first case. You're approved, then you must keep doing it. Every drug manufacturer must keep doing what they told the FDA they were going to do, branded and generic. The upshot of the rationality if you told the FDA so in that sense, everything is required. Everything that you tell the FDA you're going to do is required. I understand. What was the other question about submission? I really wanted you to address Foley because Justice Scalia quite frankly, just dropped it out of Merck. He quoted the I'm trying to figure out what Foley means. Right. He just dropped it out of the quote as though it weren't actually part of the statute, which is really not the way I generally view him on statutory interpretation. I don't know that it was meaningful. It wasn't argued in that case. I'm trying to figure out what Foley modifies. Does it mean that when you are doing it, you really have to be doing it for FDA approval or for an FDA submission of some sort, but you can then later use the information that resulted from those tests for publicity, for raising capital, whatever. What does Foley model? Foley for uses reasonably related to development and submission information. What do I do with Foley? Two things. One, I think you're right. Foley has to be given some meaning because it's there. I think it modifies for uses. It has to be solely for uses reasonably related to the development and submission of information. Here, the use they're putting to which they are putting our patented method is commercial manufacturing. It's a commercial manufacturing method in the patent. That's true in the very beginning of the approval process. When you're developing an alternative drug, you're doing it, obviously, with an eye to commercial exploitation. This is not an abstract approval by the FDA. It's an approval so that it can be commercialized. Correct? That's a very different context, Judge Dyke. When you're doing it to get approval, you're doing it to prove to the FDA that I am able to make the drug I am trying to get approval to make. Foley, in that context, doesn't mean solely for FDA purposes. There, you are doing it. You're doing it solely to develop information to give to the FDA to try to get approval. You're doing it also to develop a commercial product, right? Well, if that were true, then there would be nothing within the safe harbor, right? Because it's solely in that you're doing it then to get approval. There's no dispute that they're doing it now to make sure their product that continues along the manufacturing line and goes into the syringe. I don't understand the distinction. In the first place, when you're developing the product, your idea is I'm doing this to develop a commercial product. And you are also developing information in the course of that for the FDA. So it isn't the information is not solely for the FDA. It's also, even at that stage, for commercial purposes, no? It is ultimately down the road, incidentally, going to set you up to commercially market. That's the purpose of the safe harbor. I mean, the whole legislative history shows that it's to allow the generics to get ready to market so that there won't be an undue extension on the branded patent because it takes a while to get regulatory approval. But you're allowed... I think if you go back to the reason the legislation was passed and the Roche v. Bolar case that it was meant to overturn, there, the opinion of this court said that even though they were using the patent convention solely to try to apply to the FDA to get approval, there was infringement. And that was part of the patent convention. It looked at it in that light, Judge Dike. I think you can say that we were doing it to develop information, which developing information is more than just record, regular, ordinary, commercial activity. It has a different connotation. To develop information, to submit for potential regulatory approval, which is exactly what Merck and Eli Lilly talk about the purpose of, then it is solely for that purpose. But here, it's not solely for that purpose. Even if it's also, incidentally, to maintain records to show that they're complying with their batch for sale. And that's just totally different than the batches when they were making them to try to show the FDA they could get regulatory approval. That's the kind of development and submission that the FDCA, where it talks about submission. So I think you have to look at the word solely for uses reasonably related to development submission altogether as a package in context. Can I make one more point, Judge Dike, about commercial? Yeah. One brief point. In context, too, if you look at the broader Hatch-Waxman scheme, in the E provisions, E2, when you bring a suit, the E4 remedies talk about stopping commercial sales, which is distinct from the uses under E1 for approval. Thank you, Your Honor. We'll give you four minutes. Thank you very much, Judge Dike. Let me please the Court. Henry Dinger, I'm arguing for Teva Pharmaceuticals. In the case against Teva, you don't have to deal with the interpretation of E1, even though I'm prepared to argue that you already did so in the earlier Memento De Emphis case. Isn't there a legal reason Teva has to use Memento's patented process if it wants to sell enoxaparin? The answer is I don't know. I don't think there's anything in the statute that addresses that, because this Court in Memento 1 said that it didn't matter, even if there were alternatives. The statute doesn't require it. You indicate in your brief, in the red brief, that the FDA requires manufacturers to comply with the USP monograph for enoxaparin. It requires a release test. The FDA requires that the enoxaparin that is sold, the generic enoxaparin that is sold, have certain chemical characteristics, and the test that Teva uses and Teva has only received FDA approval to sell enoxaparin that has those chemical characteristics. The test in question is intended to establish that the batch that is sampled has those characteristics. That is why it is reasonably related to the development of submission of information under federal pharmaceutical law. Does the USP monograph still recite the release test that was performed when enoxaparin was first approved in 1993? I don't know the answer to that. I'm not sure that's in the record, Your Honor. That wasn't the basis on which the case, the summary judgment was argued or the district court decided it. Does the testing here have a purpose other than FDA? The question is, would it be done had not the FDA required it? The answer is, we don't know. The fact is, it is done in order to demonstrate that the enoxaparin that's being produced conforms to the drug that was approved when the FDA approved our answer. I understand there seems to be a lack of fact in the record about some of these issues, which may have to be developed later. But let's assume that there was proof and that it were established that the testing would have been done for commercial purposes anyway, quite apart from any FDA requirements. Would we then be within the safe harbor or not? I would say no, Your Honor, because the cases of this court have made it clear that whatever solely means, you've explained what it doesn't mean. And what it doesn't mean is that you can't use if you use a patented process that is otherwise within the safe harbor and the use of that patent generates information. This court has made clear that you can use the information generated. That seems to be a bit different from my hypothetical in the sense that there the FDA information is generated and the FDA information is used for other purposes, whereas in my hypothetical, the initial processing or testing has a dual purpose, one for the FDA and also for commercial purposes and that it would have been done for commercial purposes, even if there hadn't been an FDA requirement. I don't believe that issue was developed at all below, but I suggest that it is both under this court's interpretation of 270E1 and under 271G it is not relevant, at least in the Teva case, because to the extent we use this process, and that's disputed, but you can assume that we do for purposes of this appeal. Our product is not made by this process. Before you move on to that though, can I ask you when you file your submission to the FDA and you get approved to manufacture a drug, aren't you approved to manufacture it only precisely as you submitted and were approved? It must conform to the specifications set forth in the abbreviated new drug application. Yes, you're required to do that. The natural extension of your argument, it seems to me, would be that every step in the manufacturing process, every single step, is required by the FDA. You're required to submit to the FDA exactly what steps you will undertake, and then you're not allowed to deviate from it. Do you see the problem I have? The problem is if simply FDA requirements is necessary, then there's nothing left to do under your argument, because you have to submit to the FDA precisely what you will do, and then you have to follow it, and if you deviate from it, you're not following FDA requirements. Yes, to the extent that the manufacturing process is identified in the end, you have to follow it. And you would be violating FDA requirements if you failed to do so, correct? Yes. You would, although this information goes to the very definition of the drug that's approved. The noxiparin, this goes to establish, the FDA has defined the characteristics that establish bioequivalency. Well, it seems to me, to follow up on Dr. Koh, if the contention is that you've selected a manufacturing process and told the FDA about it, and therefore it comes within the safe harbor in each, and that seems to me a hard argument. You have to be, I would think, saying that the testing here is designed to show FDA compliance for an independent FDA requirement, rather than a requirement of your own manufacturing process that you've chosen for your own reasons. Is that clear enough? I understand the question, Your Honor, but I think this Court has already said it doesn't matter whether you pick, whether there are non-infringing alternatives. I think the Court squarely held that. That's fine, but the fact that there are non-infringing alternatives is probably true in initially developing information for initial FDA approval. There may be different ways of doing it, and yet it doesn't make any difference that you've chosen the patented method. You still get the benefit of the safe harbor. This question, it seems to me, is a little bit different, and it looks like bootstrapping. If you say, oh, well, we chose the manufacturing method, we told the FDA how we were going to manufacture the drug, and therefore the process is a process that's required by the FDA, that doesn't feel right. I think it is the same issue, Your Honor, but I really would like to get to the made-by argument, because the answer to your question doesn't matter in the TEVA case, because the only basis for liability directed at TEVA is 271G, which requires that the product that we sell in the United States be made-by the patented process overseas. No, that's not true. Neither side has bothered to look at the Senate report at the time this legislation was passed, which says specifically that it applies both the products made in the United States and made abroad, and the reason for that is that before 271G was enacted under Supreme Court and Circuit Authority and our predecessor, Courts Authority, 271A was not infringed by the making of a product according to a patented process. And so the Senate report, if you look at the Senate report, you will see an explicit statement that this is covering both the products made abroad and those made in the United States. But the fact remains, in order to, in order for 271G to apply the product that is imported or sold must be made by the patented process. The only patent here is a patent process. There are no product patents at issue in this case. And so it must be shown that these enoxaparin products, the Teva cells in the United States, were made by a process and it wasn't because of the nature of the patent in suit. This is a patent that is solely designed to generate information, data about a product. I don't know, data about a product, so you can decide which pieces, which batches to move forward with for further manufacturing. Is it made by, if you are not permitted to sell it, other ones? No, I don't think so, Your Honor. I mean, and your opinion in the Philip M. Adams case supports that. In that case, the plaintiff alleged that the patent allegedly infringed by the certification process that was challenged was integrated into the manufacturing process. And this court said, no, all it does is develop information about the product that it conforms to a particular standard, just as the patent is alleged to be used in this case. And this court repeatedly said that's not good enough. It is not a step in manufacturing. It is not a step in synthesis. That is how this court, in the Bayer case, distinguished by a technology group. In that case, the product, I mean, the patented process was used to synthesize something, to create a material object. Here, the only purpose of the patent is to develop information, and even if the information is used in a manufacturing process, that does not change the analysis. It is not a patent to make anything that is sold. My time is up. I'm happy to, if you have additional questions. Okay, thank you. Mr. Hayes? Oh, I'm sorry. Mr. Shah. Thank you, Your Honor. May it please the court to seek Shah for the Amphistar at the least. Let me start with the solely limitation, since that's gotten some attention today. It is true that this patent, the 886 patent, to the extent that it's infringed at all, is used for the purpose of complying with the FDA requirements. That is what the safe harbor requires. There is no dispute that Amphistar is using this patent to comply with the FDA requirements. Now, with the other side saying, well, they're also using this as part of their manufacturing process. I would submit that is not true. There's nothing in the record that would suggest that Amphistar would use this method, this allegedly patented method, to use this without the FDA requirement. But putting that aside, even assuming there was some other commercial purpose at use here, of which there is no evidence, I think this court's decision is quite foreclosed. One, by this opinion in Momento 1, this court's opinion in Momento 1, but before that, by this court's opinion in the Abtox case. Here's what Abtox's case specifically says about the solely limitation, and I'm quoting from page 1030 of the Abtox decision. The statute therefore does not look to the underlying purposes or attendant consequences of the activity, as long as the use is reasonably related to FDA approval. In other words, the statutory language allows a company to use its data from the test for more than FDA approval. And here's the sentence, a few sentences down in that same paragraph, quote, as long as the activity is reasonably related to obtaining FDA approval, Jacob's intent, the company's intent, or alternative uses are irrelevant to its qualification to invoke the 271E1 shield. That is precisely the situation. And the other cases on which you rely are cases in which the information would have developed for the FDA only. The purpose of the original development of the information was only for FDA purposes. And then once the information was available, it was then used for these other purposes. Your Honor, that's not true. If I may respectfully respond, that's not true in Abtox. The whole premise of Abtox litigation is, the other side argued, they're not doing this for FDA approval. They're just doing this so that they can promote their product. They're developing this information to promote the product. They never had any intent to submit it to the FDA. That is the fact situation in Abtox. Here, we're on stronger ground than Abtox because everyone agrees they're at least doing this to comply with the FDA requirement. They couldn't sell this drug without using it to comply with the FDA process. Now Momenta's arguing, well, they're also using it for this commercial objective. And if something is clear in Abtox... You're kind of yelling at us. Oh, I'm sorry. So try to turn the decibels down a little bit. Sure. And slow down a little bit, too, because we're going really fast. So when it comes to solely, though, I understand your argument about what Abtox stands for. And it's not a bad argument. Judge Dyke pointed out that there may be some differences. But importantly, how does it give meaning to the word solely? Can you tell me how... I mean, because I can't read the word out of the statute. And if I read Abtox the way you're suggesting I should read that prior page of ours, I may be down by it. And if I am, I'll live with that. But how does the word solely still have any meaning at all in the statute under your interpretation? Sure, Your Honor. So I think solely does still have content under our reading of the statute. And I think the SG's brief, the Solicitor General's brief in the Claflin case, which was also addressing the... Yes. They, I think, proffer the work that solely is doing in the statute. And here's what they say. Particular use may be, and it's on page 17 of the SG's brief, that the particular use may be reasonably related to the development and submission of information, and therefore may fall within the safe harbor even if it serves other purposes as well and also advances other commercial objectives. It cites Abtox. Then it says, by contrast, and here's where it gives work to solely to answer your question. By contrast, if a defendant makes multiple uses of a patented invention, e.g. by selling a patented drug commercially while simultaneously administering it to research subjects during a controlled study, one use may provide a basis of infringement liability even though the other use falls within the safe harbor. So what solely the work is doing, let's say a company, is using the patent invention in two distinct subsets of its activities. One it's using as part of a clinical research study. The other, it's selling the drug. What the SG's brief does is give content that says, well, yes, the clinical study, that's certainly protected, but just simply selling a drug for commercial purposes, that's not. And so that's what solely does. It doesn't give a blanket use to the company to use the patented product for whatever purposes, for whatever uses it wants to. If it's using it for multiple different things, it has to be one of those and not the other. You stopped short of the page 18 paragraph, which further elaborates on what they mean, and I'm not sure that the government is really arguing what you said, which is that they say in post-approval context, that inquiry may be substantially more difficult because the drug makers simultaneously engage in ordinary commercial manufacturing sales of a product in question. In such circumstance, the more nuanced analysis required, a drug maker's use for patented invention and routine commercial activity is not immunized from infringement liability merely because, for example, the company may periodically report adverse reactions to the FDA. Why doesn't that feel a lot like this case? You are maintaining these documents just in case the FDA wants to come and inspect them and say, by the way, don't do very often, but they do do randomly and occasionally. And then, even then, they come by to inspect them. I'm not sure if that means submitted. They can, if they so choose, ask you to copy them and they'll take them away with them. Maybe that means the submitted language, maybe. But you see, I kind of feel as though the maintenance of records in this scenario feels a lot like keeping records to report adverse reactions to the FDA. No, Your Honor. We're going to move to the submit versus maintenance argument. But this is also in solely. You were telling me the SGS reported your view of solely, and I actually think it doesn't. I think the subsequent sentences indicate that they think that when you're doing something for mass production and commercial manufacturing, it doesn't call. No, I would disagree with you. I think the SGS brief does support our example. If you read a couple sentences after the sentences you read, it then repeats the example that I gave of when a use wouldn't be solely. Likewise, if it directs it to a clinical trial as opposed to routine commercial sales, that would be protected under the plain terms of the statute. But here's the point I would make. There's slippery slope argument that this will open it up to everything in it. This will license a wholesale infringement of manufacturing processes or to the extent the SG briefs purely commercial manufacturing processes. That is not what this case is. So stop there. That seems to me a critical point. What I referred to as bootstrapping where you use a process in the course of manufacturing, you have to keep the records to show that you used the process that you told the FDA that you were going to use. It can't be that by choosing a process and then telling the FDA about it and keeping records to show that you did it brings about the safe harbor. It has to be something more than that, no? Yes, it does have to be something more than that. Let me tell you the two things that's more than that. One is, this is an FDA prescribed test to meet the USP standard. The USP standard has to be 15 to 25%. The USP also has a companion test, which it makes the official test. That's the language it uses. I'm not saying it's the only test. And this court has said even if there are alternatives, that's not dispositive. But you keep talking about all that and so it matters. First off, it doesn't matter to his client at all, right? Because at best it's law of the case and his client does not susten the law of your case. At worst, under the Supreme Court jurisprudence, it's not binding because it was a tentative finding, maybe the preliminary stage of the analysis, which wasn't made brief or argued before anybody, so it kind of feels an awful lot like it fits right in that Supreme Court suite bottom line. It isn't given law of the case status. Well, Your Honor, even if you want to say it was completely correct on the non-infringing... I appreciate the validation. But if I can explain why it's correct, it's because the non-infringing alternative solely, as this court pointed out, does not modify the patented invention. It modifies its use as reasonably related to. There's nothing in the safe harbor that suggests it has to be the solely available use in order to qualify it. But here is why, Judge Knight, getting to your question, why it doesn't encompass everything in there. I think there's a sharp distinction to be drawn between the type of testing method here to comply with the USP standard to show it's within the 15 to 25 percent range that it's a safe product, and any number of wholesale manufacturing processes that would be used to do it. The limitation comes from the text of the safe harbor itself. But the FDA doesn't require you to use their patented process. This record is clear. This was not the record before the court previously at the preliminary injunction stage where everybody accepted that let's assume for purposes of PI this is the only way of doing it. But the record now is clear that this is not the only way of doing it. There are non-infringing processes you can use to determine whether your batch falls in the 15 to 25 percent range. So how can you say their patented process is required for you to use to comply with FDA requirements? Your Honor, again, I would disagree with you. It wasn't presented in the first case. Momentum made that argument. I want to know how we can respond to the argument on the merits why you are required by the FDA to use their patented process when there are non-infringing methods you could use to obtain the identical information. Your Honor, because the word solely does not modify the patent invention. There's nothing in the safe harbor that says you must use. You stood here and argued in response to Judge Dyke's question that you are required to perform this patented process by the FDA. No, you are not. I want a clear yes or no. Are you required to perform the patented process by the FDA or are you simply required, I guess you can't ask this yes or no, so I'm giving you an alternative. Are you required to perform the patented process by the FDA or are you required to determine whether or not it's 15 to 25 percent compliant? It is the latter and the way that Amthastar satisfies the latter is by doing the official USP test. And in terms of initial approval, there's no requirement in the statute that the test be the only way of doing it. As long as you run the test to submit to the FDA, nobody's ever contended that that wouldn't be covered by the safe harbor simply because there was an alternative test. That's right. Yes, Your Honor, and it's the same test that applies pre-approval and post-approval. So I don't know where you read in that limitation in the post-approval category that suddenly says the non-imprinting alternatives, which are okay in the pre-approval test, are no longer okay in the post-approval test. Let me go back to my question one more time. Are you required to perform the patented process by the FDA? No, Your Honor. We perform that to satisfy the FDA requirement that it satisfies the 15 to 25 percent requirement. To be clear, you choose to use the patented process to satisfy an FDA requirement but you're not required to use that process. Well, Your Honor, when you say choose, I'm not sure how to answer that with a yes or no because the FDA, when it has the USP 15 to 25 percent standard, that comes with an official companion test. If you use that official companion test, which Amstrad uses, then you know you've met all the efficacy reliability requirements. You can certainly go out and innovate on your own and come up with another test that may be more effective or more reliable. Does this record reflect the fact that there are already known non-infringing processes that could absolutely give you the same compliance information? Your Honor, they contest to use another test that is non-infringing but they made that same contention in Momentum 1. This court said Momentum 1 makes this argument that the fact that there are non-infringing alternatives does not affect the analysis for the reasons that I've stated. I don't want to repeat myself but that's what that is. Now, if I can address just briefly the policy argument or the scenario that you are drawing that, well, does this sweep into all the manufacturing methods that might be an amendment? The idea is you choose a manufacturing method, you're required to inform the FDA about that, and you're required to maintain records to show that you've kept within the parameters of your own manufacturing process. That's correct, right? But you do have to keep those records. Yes, Your Honor, but here's the distinction in this case. This has nothing to do with the chosen manufacturing method. There's no patents over the manufacturing method. There's nothing about Amthastar's chosen manufacturing methods that are issued here. The question is the same as requirement. Is this the same product that they produced at the end of their process that they said they would produce in Varianda? The patent here is a testing patent. It is specifically designed to develop information, and that is what the patent is for. It is reasonably related to development. It is not like a manufacturing patent, and when you use a manufacturing patent or process, you're using it to make the product. Now, that may incidentally generate records that you have to keep under the maintenance record requirement, but that is not the main purpose. That is not the main use. It is much more directly related, and therefore much more reasonably related to the development of information to use a testing patent like Momentus than it would be a wholesale manufacturing process which incidentally generates the record. That argument, it seems to me, gets into the question of what the purpose of the test is. You distinguish the hypothetical, the bootstrapping hypothetical I gave to you on the ground that in that situation, the primary purpose of the test is commercial rather than for the FDA, so why don't, if purpose matters, don't we have to get into purpose here? Is the purpose of this test to generate records to show FDA compliance or is the purpose of the test to ensure compliance with commercial processes? I mean, it seems to me that the purpose of the test, as you're explaining, is purpose. Your Honor, I don't think you have to get into purpose because there can't be any dispute on this record from an objective standpoint that at least Amthastar is doing this that's reasonably related to complying with the FDA requirement that they show that it's within the 15 to 25 percent standard. The fact that it may also be serving some other commercial end does not disqualify it from the safe harbor that would act. So that's how I think I would deal with the purpose inquiry. And if I could just point you to the JA-102, which is the actual text of the patent claims, their 886 patent claims, it makes clear this is not some broad scale manufacturing patent or manufacturing process. The terms of the claims itself, claim one and claim six, it claims quote, a method for analyzing an enoxaparin sample for the presence of a sugar, quote, that results from a method of making enoxaparin and the last line of that I analyze the enoxaparin sample. This isn't about making manufacturing enoxaparin, some wholesale sweeping decision in Momentum 1. This is about testing the product to develop information to generate the data to show the FDA that they're making the same thing that they said they would make. And to take Judge Moore, your baking cake hypothetical, I think it's a good one. I think our case is even stronger because at least in your baking cake hypothetical you're using the salt in the actual cake. Here you're simply taking a sample out of a batch running the test and throwing out the sample. There is nothing from the patented process. And you're using the other samples. We can throw out the sugar but kept the salt. I mean, you're using the ones that are compliant and throwing out the ones that aren't. I respectfully disagree, your honor. The default method is, Momentum uses all of its batches. The only thing that's going on here is if it runs a test which it has to run to comply with the FDA requirement. It could not sell this stuff without running the test. If that test comes out and says, this does not comply with the FDA requirement, then they discard that batch. There is nothing in the 886 patent that covers anything related to the processing, the manufacturing, the making of that. It's like if you have a food processing plant and a health inspector comes in, takes a test of the product and says, this doesn't meet the standards, throw out that batch. You would not say that that was part of the making of that food product. That's exactly what's going on here. They are doing the test per FDA requirement and they throw out the sample. That's what's happening. It's a testing, by the terms of their own patent, it is a testing patent to analyze the sample. It does nothing more. This is not a case about broad manufacturing methods. And you haven't seen a single case in the two and a half years since Momento One has been in the books that has come up on the slippery slope that they suggest. You do not have a single amicus before this court from any patent holder, manufacturing methods holder, saying that this posed a problem. And we think that's because the limitations of the safe harbor as this court construed it in Momento One provide more than adequate protection from the slippery slope arguments that they make. Mr. Schock, I want to ask you about the dog that barked in the night. You'll recall that Watson says, Holmes, the dog didn't bark, and Holmes says precisely. So in Austin, the SG's brief doesn't say some stuff. It says the Momento court additionally held that for purposes of 271E1 information may be being submitted to the FDA if it is preserved in records that FDA regulations require a manufacturer make approval for an inspection on FDA request. We express no view on the correctness of that conclusion or the court's ultimate conclusion. Yes. So what does that silence mean? Well, I think we take the SG at its word. It didn't take a position of its view on this court's interpretation of submission. But on submission, I would submit, even if you use the... We think we should ask the government for its views, since it seems like they have some. Well, they said they don't take a position, so I don't think they have views, but I don't think it's necessary, because I think this court... They don't take views on whether we were correct. Yes. Right. And in fact, they went to great pains to say, we don't take views on whether you're correct on your statutory interpretation or whether you got the outcome of the case correct. Well, here, Your Honor, is why I don't think you need to revisit submission. And if you do revisit it, you should come to the same outcome that you came to. And that's because even if you revisit it, you're not going to have a    definition of a brief, you said that MOMENTA offers on page 40 of its brief, that is, to present something to somebody for approval or study. That's quoting their brief, page 40. That's their plain meaning definition. You argue to me that the S.G. brief clearly supports your view fully. I mean, you're giving me a great idea here. Why don't we ask him and find out? Well, Your Honor, you obviously can do whatever you think is fit. I think this court's decision in MOMENTA 1, the arguments here provide ample ground to affirm and come to the same conclusion that it came on to its interpretation of the safe harbor and then reached the 271G argument. What I would say about submission, again, is we meet the plain meaning of submission that they present, present something to somebody for approval or study. That is what, the fact that they do that on-site to FDA inspectors rather than nailing in the records should not be a distinction on which it turns. And, again, even if there was some ambiguity as to whether this activity falls within the scope of submission, the language of the statute is not that they must do it for submission. It must be reasonably related to a submission. I would think we're okay on submission alone, but certainly if you add the gloss of whether keeping records so that the FDA can come, inspect it, photocopy it, and take it with them is at least reasonably related to making those records available for approval or study. Okay. Thank you, Mr. Shaw. Thank you, Your Honors. Ms. Maynard, you've got four minutes here. Thank you, Your Honors. I'd like to start with the patent. So this is a manufacturing patent, and if I can draw your attention to A84, which is the patent in the back of the blue brief in the Amthasar case, in particular, at line, in the detailed description, column 28, line 31. This information can be used to standardize the production of low molecular weight heparin compositions. I beg your pardon. I'm on page A84. I'm in column 28. This is only one of several places in the patent. I beg your pardon. I'm in column 28. I'm in line 31. It starts with the word further. Further, this information can be used to standardize the production of LMWH compositions, thus resulting in LMWH with less batch-to-batch variability and improved ratios of desirable and undesirable activities. We pull out in the Crawford affidavit, which is in the Amthasar JA at page 12436, paragraph 19, multiple places in the patent that talk about manufacturing and reducing batch-to-batch variability. And then significantly, the last step of claim 53 is selecting a batch for further processing. That is on page A105. A105. The line, column 70, starting around line 24, selecting a batch of anoxaparin based upon comparison of the determination of a test of the presence of the structural signature associated with the non-naturally occurring sugar associated with Peak 9, Figure 1, to the reference standard for anoxaparin. All that shows is you could use it for those purposes. It doesn't show that the athletes here are using it for that purpose. That's the question that we were asking. That's precisely what we've accused them of in the complaint, Judge Steist. I'm not sure about that. I mean, the complaint seems to focus more on their doing this for FDA purpose. But I understand they haven't objected to this contention being within the scope of the case. But the fact is it seems to me we can't tell from this record whether this is solely for FDA purposes or whether it has a commercial purpose. Well, two points there to address the complaint point. The first is that the  did not meet the requirements of the USP to establish our reasonable belief that they were probably infringing our patent. But what they're alleged to be doing in the complaint and then on this record the uncontested affidavits of Lew in both the Teva record and the Amthasar record detail at great length how they are infringing each step of the claims including the step of Claim 53. To your point about the solely, Judge Dyke, what they are using... So we don't know whether you're right or whether they're right. Well, this was resolved on the safe harbor grounds, Your Honor, on a summary judgment against us. Obviously there's more... So you're saying there's a fact issue. If this is a determinative, if the commercial purpose of this is determinative, we have a fact issue, right? No one disputes that they are using... Yes? No. Yes, if there's a fact dispute, there would have to be a reversal. But I think it's important to step back and look at the statute as a whole. It says solely for uses reasonably related to the development and submission of information under the FDCA. And when you look at the situations in which information is submitted, they all involve approval, FDA approval. What they are doing here and what we've accused them of doing here is simply using it in the ordinary commercial exploitation, routine commercial manufacture. It's just like the FD's brief. I think the FD's brief supports our position, not their position, with respect to solely the FD's... I guess we'll figure that out sometime, is my guess. But, apart from that question, I don't understand how either of the two passages you read to me support your notion that this is a manufacturing process. When you look at Claim 52, right after the section you read, it says selecting a batch, the very next line is to thereby analyze the sample. So I don't see how that says you're not selecting a batch for further manufacturing like you alluded to. It's to analyze. Two points, Your Honor. One, it's my understanding that in Claim E's speak, this is the way you write a claim like this, where you start out the preamble and you close it with to analyze. But, importantly, in the claim construction... How do you write a claim that is meant to be a claim that analyzes things? Is the claim opposed to a claim that manufactures things? I've never seen... What did you call it? Claiming? I've never seen a manufacturing claim that starts and ends with analyze. If I may draw your attention to the claim construction order in the court below, it's in the Teva J.A. A2345. It interpreted the selecting a batch of enoxaparin limitation to mean selecting a quantity of enoxaparin that was produced in a single process for further testing or processing. And I think if you look at the passages in the Crawford Affidavit that detail more parts of the patent, Your Honor, I think you'll see that this patent is about using the analysis to reduce batch to batch variability in manufacturing. That's exactly the use to which they're putting it here. Figuring out using information you gain from manufacturing always helps you improve or stay in the course for manufacturing. It doesn't morph that information or the test that you perform to get it into a manufacturing test. Here they're using it though, Your Honor, to decide what they're using it just like you would a mechanical sorter along a conveyor belt to decide which portion's full. Even more than that, Judge Wallach, they're using it to decide whether interim drug substance goes in or out along the manufacturing line. If it fails the test, it's like it's rejected by the mechanical sorter and if it passes the test it goes on and it's joined together with other batches that pass and sold in the syringe. Okay. Thank you, Ms. Maynard. We're out of time. Thank you, Your Honor. The two cases are submitted and that concludes our session for today. All rise.